UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION

**ANTHONY TAYLOR, JR.**,

*Plaintiff*,

v.

**NORTHERN STAR LENDING, LLC,**
**CRYSTAL CHAPMAN-CHEVALIER**
*individually and in her official capacity*,
**WOLF RIVER DEVELOPMENT**
**COMPANY,** *and* **UNKNOWN**
**PERSONS 1-10,**

*Defendants*.

Case No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW**, the Plaintiff, **ANTHONY TAYLOR, JR.** ("**Mr. Taylor**" or

"**Plaintiff**"), by and through his undersigned counsel, Seraph Legal, P.A., and

complains of the Defendants, **CRYSTAL CHAPMAN-CHEVALIER** ("**Chapman-**

**Chevalier**"), individually and in her official capacity as CEO of WRDC,

**NORTHERN STAR LENDING, LLC** ("**Northern Star Lending**"), **UNKNOWN**

**PERSONS 1-10,** and **WOLF RIVER DEVELOPMENT COMPANY** ("**WRDC**")

(collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1. This is an action for damages brought by Mr. Taylor against Northern

Star Lending for violations of the *Florida Consumer Collection Practices Act*, § 559.55,

Fla. Stat., *et seq.* ("**FCCPA**"), against all Defendants for violations of the Florida *Civil Remedies for Criminal Practices Act*, § 772.101, Fla. Stat., *et seq.* ("**CRCPA**"), and the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), and against Chapman-Chevalier for *Injunctive Relief.*

## JURISDICTION AND VENUE

2.     Subject matter jurisdiction for Plaintiffs' federal claims arises under RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

3.     This Court has supplemental jurisdiction for Plaintiff's state law claims under the FCCPA and CRCPA pursuant to 28 U.S.C. § 1367.

4.     The Defendants are subject to this Court's jurisdiction pursuant to § 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

5.     Venue is proper in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this cause of action occurred within Florida, including in this District and Division.

## PARTIES

### Plaintiff

6.     Mr. Taylor is a natural person residing in Miami Gardens, Miami-Dade County, Florida.

7.     Mr. Taylor is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

**Chapman-Chevalier**

8.      **Chapman-Chevalier** is an individual who, upon information and belief, resides in Keshena, WI and is a citizen of Wisconsin.

9.      At all times relevant, Chapman-Chevalier served as the Chief Executive Officer ("CEO") and/or a principal director of WRDC and Northern Star Lending.

10.     Mr. Taylor sues Chapman-Chevalier in her individual capacity for monetary damages, and in her official capacity as an officer of WRDC for injunctive relief only, and not for monetary damages.

11.     Chapman-Chevalier personally participated in, managed, operated, and directed the affairs of the unlawful lending enterprise described herein. Specifically, she exercised operational control over the creation, funding, dissemination, and collection of the usurious loans marketed under the Northern Star Lending brand.

12.     As WRDC's CEO, and on information and belief, Chapman-Chevalier has the authority to direct, and to cause the cessation of, the collection activities of the lending entities incorporated under the laws of the Menominee Tribe that WRDC operates.

13.     On information and belief, Chapman-Chevalier can be served at **W2907 Tribal Office Loop Road, Keshena, WI 54135**.

## Northern Star Lending

14. **Northern Star Lending** claims to be an economic development arm and instrumentality of the Menominee Indian Tribe of Wisconsin (the "**Menominee Tribe**"), a federally recognized sovereign Indian nation.

15. Per its website, Northern Star Lending's mailing address is P.O. Box 818, Keshena, WI 54135. *See* northernstarlending.com/contact-us (accessed July 1, 2026).

16. Northern Star Lending makes loans from $200 up to $5,000 to consumers through its website, with interest rates at an annual percentage rate ("APR") exceeding 600%.

17. Northern Star Lending may be served at **W2907 Tribal Office Loop Road, Keshena, WI 54135**.

## WRDC

18. **WRDC** is an entity located at **W2907 Tribal Office Loop Road, Keshena, WI 54135**.

19. The activities of WRDC include high interest loans.

20. WRDC operates Northern Star Lending through one of its subsidiaries, Four Directions Lending, LLC and/or Five Clans Lending, LLC.

## Unknown Persons 1-10

21. **Unknown Persons 1-10** are non-tribal persons, both natural and otherwise, and include persons who provide revolving lines of credit to the Northern Star Lending enterprise, direct and control the Northern Star Lending enterprise, as

well as the bank or gateway processor who provides access to the Automated Clearing House ("ACH") payment network. Plaintiff believes he can determine the true identities of these individuals through discovery and will amend his complaint once their true names have been ascertained.

## FACTUAL ALLEGATIONS

### Northern Star Lending Makes Unlawful Loan to Plaintiff

22.     On July 19, 2024, Northern Star Lending made a personal loan of $1,150 to Mr. Taylor (the "Loan") via its website northernstarlending.com. **SEE PLAINTIFF'S EXHIBIT A.**

23.     The Loan assessed interest at an APR of 745.63%, which required Mr. Taylor to repay $9,105.51 over a period of 12 months. *Id.*

24.     Ostensibly, the Loan was made by Northern Star Lending, an entity incorporated under the laws of the Menominee Tribe, a federally recognized Native American Tribe in Wisconsin.

25.     However, as explained in more detail below, the true lender was a non-tribal entity and its non-tribal investors. Despite ostensibly being "tribally owned," the non-tribal entity operates, overwhelmingly, for the benefit of non-tribal persons.

26.     Northern Star Lending or one of its service providers deposited the proceeds from the Loan into Mr. Taylor's bank account in Miami Gardens, Florida.

27.   Shortly after wiring the proceeds of the Loan to Mr. Taylor, Northern Star Lending started to debit bi-weekly payments towards the outstanding balance from Mr. Taylor's bank account in Miami Gardens, Florida.

| 08-08 Paid To - Northern Star Le 8773355990 Chk 8100143 | 350.36- |
|---|---|

28.   Mr. Taylor made payments towards the Loan, virtually all of which was applied to the interest.

29.   Mr. Taylor utilized the proceeds from the Loan for family, personal, and household purchases.

30.   Thus, the Loan meets the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

### The Loan Took Place in Florida and is Subject to Florida Law

31.   At all times relevant, Mr. Taylor lived in Florida.

32.   Mr. Taylor applied for the Loan from his home in Florida and electronically signed the loan agreement in Florida.

33.   The proceeds of the Loan were deposited into Mr. Taylor's bank account he maintains in Florida and payments were debited from that same Florida account.

34.   Mr. Taylor received collection correspondence regarding the Loan at his home in Florida.

35.   The final step required of Mr. Taylor was to click a button indicating he accepted the terms and conditions presented by Northern Star Lending.

36. All of – as well as the final – necessary acts to create what Northern Star Lending purported to be a binding contract, occurred in Miami Gardens, Florida.

37. "Federal courts applying Florida law have held that under *lex loci contractus,* clicking accept is the last act needed" to confirm similar contracts, and as such, an online contract finalized in Florida is subject to Florida law. *Garn v. S. Fla. Stadium LLC*, No. 24-25087-CV, 2025 WL 1279071, at *2 (S.D. Fla. Mar. 26, 2025).

38. Consistent with this rule, a consumer's location when using an online portal of a tribal lending entity determines where the transaction occurs. *See California v. Ipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014).

39. Because Mr. Taylor transacted from, and the loan proceeds and debits ran through, Florida, the Loan occurred in Florida and is governed by Florida law.

## The Loan is Usurious Under Florida Law

40. Florida has a right to police its borders and to ensure the welfare of its residents. *Manigault v. Springs*, 199 U.S. 473, 480 (1905) ("This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.")

41.     To that end, the State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

42.     § 687.02(1), Fla. Stat., renders the issuance of a loan with an interest rate greater than 18% per year usurious.

43.     § 687.071(2), Fla. Stat., renders the issuance of a loan with an annual interest rate greater than 25% criminally usurious.

44.     § 687.071(3), Fla. Stat., renders the issuing of a loan with an annual interest rate greater than 45% a third-degree felony.

45.     § 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable. *See also* § 516.02(2)(c), Fla. Stat. (rendering debts unenforceable that originated from usurious contracts).

46.     Long-standing public policy in Florida confirms the impossibility of the alleged debt. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.").

47.     Any person who willfully makes such a loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Id.*

48.     Indeed, even the recovery of the principal balance made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. 1st DCA 1988).

49. The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 4 So. 2d 519 (Fla. 1941); *see also Pushee v. Johnson*, 166 So. 847 (Fla. 1936).

50. Florida has taken usury one step further in the consumer loan context through its passage of the Consumer Finance Act, Chapter 516, Fla. Stat. (the "Act").

51. The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

52. The Act further restricts the interest and fees a licensed consumer finance company may charge.

53. § 516.02(2)(c), Fla. Stat. indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made*.

54. Thus, Florida has made clear that in order to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Act.

55. Northern Star Lending is not licensed as a Consumer Finance Company in Florida.

56. Mr. Taylor's Loan charged an annual interest rate of 745.63%, which is 24 times the rate permitted by the Act and nearly 30 times Florida's criminal usury rate.

57. The Loan is thus unenforceable against Mr. Taylor, regardless of whether it was valid under tribal law or wherever else they might have been made.

58.     Because the Loan was subject to an interest rate greater than 25%, which exceeds the limit proscribed by § 687.071(2), Fla. Stat., the balance related to the Loan was void *ab initio* and unenforceable in Florida pursuant to § 687.071(7), Fla. Stat.

59.     The Loan thus qualifies as "unlawful debt" per § 772.102(2)(a)(3), Fla. Stat.

60.     Northern Star Lending or one of its service providers, on its behalf, made multiple collection communications to Mr. Taylor via e-mail, text message, and/or telephone in connection with the collection of the Loan within the prior 24 months.

## Northern Star Lending is a Rent-a-Tribe Scheme

61.     Northern Star Lending claims in part to be "a commercial enterprise and instrumentality of the Menominee Indian Tribe of Wisconsin," and to operate "pursuant to the laws of Tribe."

62.     As it purports to operate "pursuant to the law of the Tribe," Northern Star Lending asserts tribal sovereign immunity from criminal and civil prosecution regarding its lending policies, which constitute felonies in many states, including Florida.

63.     However, the idea that Northern Star Lending is a legitimate commercial enterprise of the Menominee Tribe is a farce.

64.     The Menominee Tribe participate in what has become known as a "rent-a-tribe" scheme.

65. In such a scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

66. While the non-tribal entities perform all substantive aspects of the operations such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the participating Native American tribe acts as a mere figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

67. However, sovereign immunity does not turn an otherwise illegal loan into a legal one; at best, it potentially creates a defense to criminal or civil prosecution of the crime. See, e.g., *United States v. Neff*, No. 18-2282 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

68. Much like complex tax shelters, the deployment of these schemes is a calculated gamble: the risk of being caught is low, and the profit potential is high.

69. Thus, these schemes continue to perpetuate, with the non-tribal puppet masters giving the tribal entity little actual authority and controlling the way the loans are marketed, underwritten, collected, and serviced.

70. While rent-a-tribe schemes vary to some degree, they all adhere to the same general framework:

a. The tribe authorizes the creation of a tribal lending entity ("TLE"), *e.g.*, Northern Star Lending, and proclaims it to be its sovereign property;

b. Non-tribal individuals issue a revolving line of credit to the TLE, which uses it to fund consumer loans and other operations;

c. The TLE and non-tribal entities sign a Master Servicing Agreement appointing the non-tribal entities managers, consultants, or similar;

d. The TLE must waive sovereign immunity and adhere to the terms of the Master Servicing Agreement as a condition of using the revolving credit line;

e. After all fees are deducted (*e.g.*, management fees, technology fees, performance fees, consultant fees, interest on the revolving credit line, etc.), the TLE is allowed to keep the remaining funds, which it typically then transfers to the tribe minus any salaries paid to a handful of tribal leaders for their "management" of the entity;

f. The tribe passes a "tribal ordinance" appointing one or more owners or principals of the non-tribal managers/consultants as a signer for checking accounts held in the TLE's name to provide non-tribal members with additional assurance that their investment is secure; and,

g. The tribe ultimately receives pennies on the dollar from the net profits.

71. Very little of Northern Star Lending's business is conducted on the Menominee Tribe's reservation, and what little may be done on the reservation amounts to nothing more than ministerial and administrative functions.

72.    The server hosing the lending platform is not even located in the United States; the IP address for northernstarlending.com is 52.220.211.246, which corresponds to a location in Singapore, around 9,200 miles away from the Menominee Tribe's reservation.



73.    Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and their investors.

**The Tribe's Previous & Current Involvement with Payday Lending**

74.    The Menominee Tribe and WRDC have a long-standing association with the payday lending industry.

75.    WRDC and the Menominee Tribe have also claimed to own and operate several other online payday lenders including:

- Elk Lending, LLC (elklending.com),

- Moose Lending, LLC, dba Lending Creative (lendingcreative.com),

- Crane Lending, LLC, d/b/a Crane Finance (cranefinanceusa.com),

- Wolf Lending, LLC, dba Premier Loan Solutions (premierloansolutions.com),

- Eagle Lending, LLC, dba Fineday Funds (finedayfunds.com),

- Mustang Lending, LLC, dba Painted Horse Loans (paintedhorseloans.com); and

- Night Winds Lending, LLC (nightwindslending.com)

76. WRDC utilizes Four Directions Lending, LLC and Five Clans Lending, LLC as the two primary corporate "umbrella" subsidiaries to operate and route funds for the above listed lenders, as well as Northern Star Lending.

77. In response to a request for boxholder information, the Postmaster in Keshena, Wisconsin, identified the holder of P.O. Box 818, the address Northern Star Lending transacts business from, as "Northern Star Lending, W2828 Go Around Rd., Keshena, WI 54135."

78. The W2828 Go Around Road address corresponds to WRDC's office building – a single, mixed-use facility that, by WRDC's own description, houses commercial suites leased to outside tenants, a drive-through coffee shop, small-business incubator offices, an entrepreneurial and workforce training center, and WRDC's general administrative offices, within which online lending is described as a single "division."

79. A facility of that character neither contains nor could contain the underwriting, loan servicing, customer service, electronic funds transfer, and collections operations required to originate, service, and collect a nationwide portfolio of high-interest loans marketed under Northern Star Lending and the numerous affiliated brands listed above, which collectively loan tens of millions of dollars each month.

80. Indeed, the Tribe's own governmental Lending and Tribal Taxes Department appears to be staffed by only two individuals.

81. On information and belief, the underwriting, servicing, customer-service, and collections functions attributed to Northern Star Lending are instead performed off-reservation by non-tribal operators and financiers described herein.

82. Northern Star Lending is not an enterprise operated by and upon the lands of the Menominee Tribe.

83. An examination of the Tribe's other lending platforms reveals the Tribe's lack of involvement, generally, in loan platforms it claims to own and operate.

84. For example, Wolf Lending, LLC, d/b/a Premier Loan Solutions, is beneficially owned and operated by the non-tribal Rivo Holdings, a lending enterprise owned and operated by Daniel and Mark Koetting. Daniel Koetting has been involved in a number of "rent-a-tribe" schemes dating back more than a decade with various other small Native American tribes.

85. Fineday Funds is beneficially owned and operated by Andrew Dunn ("Dunn") through Soaren Management. Dunn has been key in the operation of a large number of "tribal" lending platforms, including LendUMo (lendumo.com), a lender incorporated under the laws of the Lac Du Flambeau Tribe of Lake Superior Chippewa Indians, in Lac Du Flambeau, Wisconsin (the "LDF Tribe"). Indeed, an examination of the websites of lendumo.com and finedayfunds.com shows a considerable number of similarities.

86. Crane Finance, another of the Menominee-branded lenders listed above, is likewise operated by non-tribal persons. Crane Finance is operated and beneficially owned by DMP Investments LLC, a Texas limited liability company, and William C. "Cheney" Pruett, a long-time Texas payday-loan operator. Pruett previously operated a similar rent-a-tribe model with other tribes, including the LDF Tribe (Sky Trail Cash) and the Fort Belknap Indian Community (RiverbendCash.com).

87. Crane Finance thus provides a further concrete example of the same enterprise-wide pattern: a Menominee-branded lender whose substantive operations are conducted, and whose profits are taken, by non-tribal operators off the reservation.

88. Despite ostensibly being the intellectual property of the Tribe, Northern Star Lending's website bears many similarities to other payday lending platforms which claim to be owned and operated by a different tribe.

89.     For example, Hidden Meadow Lending, which operates from hiddenmeadowlending.com and claims affiliation with the Iipay Nation of Santa Ysabel (the "Iipay Tribe"), utilizes virtually identical images on its  website as Northern Star Lending.

90.     Each platform contains the same eight squares with the titles, "Hospital Bills," "Lost or Broken Phone," "Vet Bills," "Owed Taxes," "Moving Expense," "Car Repair," "Utility Bills," and "Rent and Home Repair."





91.     The two websites also share design and content that ordinary, independently created tribal enterprises would not both contain by mere coincidence.

92.    Beyond the matching "emergency uses" graphic depicted above, both sites quote the exact same, unusual Annual Percentage Rate range for their loans of 630% to 780%, and both websites contain additional blocks of identical marketing text, word for word, with only the lender's and tribe's names changed.

93.    This matching language is distinct from the generic ownership recitals and federally prompted cost disclosures that appear on tribal lending websites generally; it is product-specific marketing copy that independently operated enterprises would not, by coincidence, write the same way.

94.    The two websites are also built on a common architecture, organized into the same distinctively named sections, including "Who We Are," "Loan FAQ," "Lending Best Practices," "Rates," "Privacy Policy," "Contact Us," and "Opt Out" – presented in the same order and arrangement.

95.    This shared structure, like the shared text, reflects a common origin: a single template deployed by a common, non-tribal operator across multiple purportedly tribal lending brands, rather than the independent work of separate sovereign enterprises.

96.    As aforementioned, northernstarlending.com operates from the IP address of 52.220.211.46 which is located in Singapore.

97.    Yet another "tribal" lender, Right Now Loans, which previously operated from rightnowloans.com, had a virtually identical IP address of 52.220.170.42, also located in Singapore.

98.    Right Now Loans claimed affiliation with the Elem Indian Colony of Pomo Indians (the "Pomo Tribe"), another tribe with a documented history of renting its sovereign status to non-tribal lenders.

99.    Much of northernstarlending.com and rightnowloans.com has been copied-and-pasted – for example, both websites contain the same graphic with an "apply now" button with a slider allowing a borrower to select a loan amount between $200 and $5,000.

 

100.   Both websites, under the section "How It Works," contain the same "Apply Online," "Verify Information," and "Get Approved," featuring the same graphics used with each step.





**Judgment Against Northern Star Lending Would Not Reach Tribe's Treasury**

101.     The Menominee Tribe chose to pursue interstate online payday lending through the creation of legally separate limited liability companies; WRDC, Northern Star Lending, Four Directions Lending, LLC, and Five Clans Lending, LLC.

102.     As an independent entity, Northern Star Lending, LLC is not an arm of the Menominee Tribe and not entitled to share in the Menominee Tribe's sovereign immunity. *See Galette v. New Jersey Transit Corp.*, 146 S. Ct. 854 (2026).

103.     *Galette* held that if a government is not formally liable for an entity's debts, that entity is likely not an arm of the government.

104.     The arm-of-the-sovereign analysis applies with equal force to assertions of tribal sovereign immunity by purportedly tribal commercial entities, and the entity claiming immunity bears the burden of establishing it.

105.     Most fundamentally, a judgment against Northern Star Lending would not be paid from the Menominee Tribe's treasury. Northern Star Lending holds its own property, including its loan receivables. It entered into its own contracts, including the Loan Agreement at issue here, and it pays its own debts.

106.    On information and belief, Northern Star Lending was capitalized through one or more revolving credit lines extended by non-tribal persons, and neither its chartering documents nor tribal law renders the Tribe legally responsible for its obligations.

107.    The Loan Agreement's own recitals confirm the point, describing Northern Star Lending as "a subsidiary of Four Directions Lending LLC, an economic development arm and instrumentality wholly owned and controlled by" the Tribe, while expressly preserving the Tribe's immunity and purporting to grant only a narrow, Company-specific "limited waiver of sovereign immunity" that "does not include any waiver, either express or implied, to any third party" and "does not include a waiver … by the Tribe or any other Tribal entity."

108.    By the Defendants' own drafting, then, the Tribe disclaims legal responsibility for the lender's obligations, and recourse respecting the lender begins and ends with the lender's own assets.

109.    Mr. Taylor does not name the Tribe as a defendant, does not challenge the Tribe's sovereignty, and seeks no monetary relief against the Tribe, its governmental revenues, or its lands.

110.    Any money judgment sought by Plaintiff would be satisfied from the assets of the commercial entity and of the non-tribal operators and financiers who took the overwhelming share of the loan revenue – precisely the configuration in which sovereign immunity is unavailable. *See Ransom v. GreatPlains Finance, LLC*, 148 F.4th 141 (3d Cir. 2025) (tribally chartered lender that could not show a judgment

against it would impact the tribe's finances, and whose non-tribal investor constrained the tribe's control, was not an arm of the tribe); *Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) (entity asserting tribal immunity bears the burden of proving arm-of-the-tribe status).

### Defendants' Scheme Constitutes an Enterprise Under RICO & CRCPA

111.   RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

112.   In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

113.   CRCPA, § 772.102(3), Fla. Stat defines an "enterprise" as any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities."

114.   Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

115.   Defendants are an association in fact enterprise who are associated together for the common purpose of making, collecting, and profiting off illegal loans.

116.   Courts throughout the nation have held that even the provision of ordinary and legal services (*i.e.*, the provision of data analytics and underwriting) can create liability under RICO if the actors are aware of the greater scheme afoot. *See, e.g. Smith v. Berg*, 247 F. 3d 532, 537 (3d Cir. 2001) (relying on *Salinas v. United States*, 522 U.S. 52 (1997) (holding that a court may not dismiss a RICO claim against an alleged conspirator simply because the defendant characterizes itself as having merely provided ordinary services, if there are plausible allegations that those services were provided with an awareness of the broader scheme being furthered).

117.   Here, the enterprise works as such:

a. WRDC created and maintained a revolving door of wholly-owned, nominal LLCs, including Northern Star Lending, to act as consumer-facing brands to absorb legal scrutiny. WRDC entered into agreements with non-tribal financiers to "rent" the Menominee Tribe's sovereign immunity, allowing the enterprise to falsely claim that its digital lending platforms were immune to state interest caps, including Florida's. It directed its subsidiaries to target out-of-state consumers with predatory loans carrying APRs frequently exceeding 600%.

b. Northern Star Lending served as the direct instrument of consumer deception and unlawful collection. Specifically, it acted as the nominal

lender on the face of the consumer loan agreements, falsely representing to borrowers that the transactions were executed on sovereign tribal land and were governed exclusively by tribal law. It interfaced with ACH payment networks to systematically pull electronic fund transfers directly from the personal bank account of consumers like Mr. Taylor. It served as a financial pass-through entity, routing the vast majority of usurious interest revenue away from the Menominee Tribe and into the hands of non-tribal enterprise backers, retaining only a minimal nominal fee (often only 1% or 2%) for the Menominee Tribe.

c. Chapman-Chevalier acted as the CEO of WRDC and its lending subsidiaries, including Northern Star Lending, directly supervising the outside relationships with non-tribal persons which are the crux of the WRDC's high-interest lending portfolio. She personally signed, authorized, and approved the foundational business agreements with non-tribal fintech partners, lead generators, and capital investors that allowed the enterprise to function. She engaged in these actions in her individual capacity and official capacity, exceeding any legitimate, lawful authority granted to her as a tribal official by conspiring to violate state and federal consumer-protection laws for commercial gain.

d. Unknown Persons 1-10 actively participated in the conduct, management, and operation of the enterprise's affairs by providing the core commercial, financial, and technological infrastructure necessary

to collect unlawful debts. Specifically, they funded capital pools used to originate the usurious loans marketed under the Northern Star Lending brand, acting as the true lender while using the tribal entities as a pass-through lending operation. They provided, owned, and operated the proprietary underwriting algorithms, lead-generation software, consumer databases, and digital platforms required to run the internet-based lending operation. They conducted the day-to-day operations of the lending business, including marketing, customer service, and loan servicing, from corporate offices located entirely off tribal reservation land. They executed "rent-a-tribe" revenue-sharing agreements with WRDC and Northern Star Lending, structured so that Unknown Persons 1-10 retained approximately 97% or more of the gross revenues generated by the usurious interest payments, leaving only a nominal "rent" fee for the tribal entities. They exercised ultimate operational control over the underwriting criteria, collection strategies, and risk-management decisions of Northern Star Lending, making them the true directing minds behind the collection of unlawful debts.

118.   Mr. Taylor has been damaged through the payments he made to Northern Star Lending on the void Loan, as the Loan was void and unenforceable pursuant to Florida law.

119. Mr. Taylor also suffered severe emotional distress both upon learning that he had been the target of the Defendants' usurious and illegal loan and as a result of the Defendants' attempts to collect an unenforceable loan.

120. Mr. Taylor has hired the undersigned law firm to represent him in this matter and has assigned it his right to fees and costs.

## COUNT I
## NORTHERN STAR LENDING'S VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.

121. Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

122. Northern Star Lending violated § 559.72(9), Fla. Stat. when it asserted a debt was legitimate when it knew it was not.

123. Northern Star Lending collected payment from Mr. Taylor concerning the Loan, even though the Loan was void and unenforceable due to its triple-digit interest rate in violation of § 687.071, Fla. Stat.

124. Northern Star Lending knew the Loan's was unenforceable in Florida, as evidenced by its elaborate "rent-a-tribe" scheme designed to avoid state usury laws.

125. Northern Star Lending also violated § 559.72(9), Fla. Stat. when it asserted rights which do not exist, specifically, the right to collect the Loan's balance from Mr. Taylor when the debt was void *ab initio* pursuant to Florida law.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter judgment against Northern Star Lending for:

a.  Statutory damages of $1,000.00 pursuant to § 559.77(2), Fla. Stat.;

b.  Actual damages pursuant to § 559.77(2), Fla. Stat.;

c.  Reasonable costs and attorneys' fees pursuant to § 559.77(2), Fla. Stat.; and,

d.  Such other relief this Court deems just and proper.

## COUNT II
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.

126.  Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

127.  Through their participation in the Northern Star Lending scheme, the Defendants, together with the Menominee Tribe and others, constitute an "enterprise" under the CRCPA, § 772.102(3), Fla. Stat.

128.  The Loan carried an interest rate far in excess of Florida's maximum permitted rate and, thus, the Loan constitutes an "unlawful debt" under § 772.102(2)(a)(3), Fla. Stat.

129.  Violations of Chapter 687, Fla. Stat., amount to "criminal activity" as defined in § 772.101(1)(a), Fla. Stat.

130. The Defendants each associated with the enterprise and participated in the enterprise's affairs as described herein, which existed for the purpose of collecting unlawful debt.

131. The Defendants' participation in the enterprise violated **§ 772.103(3), Fla. Stat.**, and caused Mr. Taylor to repay amounts towards the usurious Loan's balance.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally for:

a. Threefold the amount of actual damages or, alternatively, the statutory minimum of $200, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b. Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c. Any other relief this Court deems just and proper.

## COUNT III
### DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.

132. Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

133. The Defendants each associated with the enterprise and participated in the enterprise's affairs as described herein, which existed for the sole purpose of collecting unlawful debt.

134. The Defendants violated **§ 772.103(4), Fla. Stat.**, by conspiring with each other, and other entities and individuals, to issue and collect unlawful debts through Northern Star Lending.

135. The Defendants were each aware of the enterprise's goals, and each acted in furtherance of this conspiracy as described herein.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, for:

a. Threefold the amount of actual damages or, alternatively, the statutory minimum of $200, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b. Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c. Any other relief this Court deems just and proper.

**COUNT IV**
**DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF**
**RICO, 18 U.S.C § 1962(c)**

136. Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

137. Through their participation in the Northern Star Lending scheme, the Defendants, together with the Menominee Tribe and others, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

138.   The Loan charged an interest rate more than double Florida's maximum permitted rate, and thus the Loan was an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

139.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who is distinct from the association-in-fact enterprise alleged herein. Each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the collection of unlawful debt, in violation of 18 U.S.C. § 1962(c), thereby causing Mr. Taylor to repay amounts on the void Loan.

140.   Each Defendant participated in the operation or management of the enterprise's affairs. Northern Star Lending made and collected the unlawful Loan in its own name and debited Mr. Taylor's Florida bank account; WRDC chartered and directed the nominal lending entities, contracted with the non-tribal financiers, and routed the loan revenue; Chapman-Chevalier, as CEO and a directing officer of WRDC and its lending subsidiaries, authorized and supervised the lending and collection operations and, on information and belief, executed the agreements with the non-tribal operators and financiers through which the enterprise functioned; and Unknown Persons 1-10 funded the loans, owned and operated the underwriting and servicing infrastructure, and exercised operational control over the collection of the unlawful debt. Each acted with knowledge of the enterprise's purpose and was compensated from the collection of unlawful debt, including the amounts collected from Mr. Taylor.

141.    The Defendants' participation in the enterprise violated **18 U.S.C §**
**1962(c)** and caused Mr. Taylor to repay amounts on the unlawful Loan.

142.    Northern Star Lending operated across state lines, making loans to
consumers throughout the United States. As such, the Defendants' conduct involved
interstate commerce.

143.    The Northern Star Lending business model readily acknowledges the
loans' illegal nature, and goes to great lengths to obfuscate how, and by whom, the
loans are made, attempting to deceive consumers into believing they have no legal
recourse against enforcement.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter
judgment against the Defendants, jointly and severally, ordering:

a.      Threefold the amount of actual damages, pursuant to 18 U.S.C. §
        1964(c);

b.      Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.      Any other relief this Court deems equitable and proper.

### COUNT V
### DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF
### RICO, 18 U.S.C § 1962(d)

144.    Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated
herein.

145.    The Defendants violated **18 U.S.C § 1962(d)** when they each conspired
to facilitate the collection of unlawful debts as described herein.

146.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Northern Star Lending.

147.   Northern Star Lending operated across state lines, making loans to consumers throughout the United States. As such, the Defendants' conduct involved interstate commerce.

148.   The Northern Star Lending business model readily acknowledges the loans' illegal nature, and goes to great lengths to obfuscate how, and by whom, the loans are made, attempting to deceive consumers into believing they have no legal recourse against enforcement.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages, pursuant to 18 U.S.C. § 1964(c);

b.   Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.   Any other relief this Court deems equitable and proper.

## COUNT VI
### DECLARATORY AND INJUNCTIVE RELIEF
**(Chapman-Chevalier Only - Pled in the Alternative to Counts I-V)**

149.   Mr. Taylor adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

150.   Mr. Taylor pleads this Count strictly in the alternative should injunctive relief be unavailable under Counts I-V.

151. The Tribe, by and through one or more entities incorporated under tribal law, currently claims Mr. Taylor owes a balance based upon a loan contract which called for interest to be assessed at an annual percentage rate of 745.63%.

152. Despite the Loan, and any balance resulting therefrom, being void under Florida law, one or more entities incorporated under tribal law, or agents acting on behalf of one or more entities incorporated under tribal law, have attempted to collect this balance from Mr. Taylor via texts, e-mails, and/or phone calls.

153. The Menominee Tribe's actions, by and through one or more entities incorporated under tribal law, violate Florida's strong public policy against usury.

154. No other adequate remedy at law exists.

155. As CEO of WRDC, and in her official capacity, Chapman-Chevalier has the authority to direct WRDC and its tribal lending entities to cease asserting, collecting, and reporting any balance the Tribe or any such entity claims Mr. Taylor owes on the void Loan.

**WHEREFORE**, Mr. Taylor respectfully requests this Honorable Court enter judgment against Chapman-Chevalier, in her official capacity, providing:

    a.    A declaration that the Loan's outstanding balance is void;

    b.    Injunctive relief prohibiting any further collection attempts; and,

    c.    Any other relief this Court deems equitable and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Mr. Taylor hereby demands a jury trial on all issues so triable.

Respectfully submitted this July 2, 2026, by:

**SERAPH LEGAL, P. A.**

*/s/ Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar No.: 1015954
BMorgan@SeraphLegal.com
3505 E. Frontage Rd., Suite 145
Tampa, FL 33607
Tel: 813-567-1230 (Ext: 305)
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A    Mr. Taylor's Loan Agreement with Northern Star Lending, July 19, 2024 – Excerpt